IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:20-MC-20-RJ

DR. AVNER VENGOSH, DUKE )
UNIVERSITY, GANNETT CO. INC., )
and KNOXVILLE NEWS SENTINEL, )
)
    Movants, )
)
v. )    O R D E R
)
JACOBS ENGINEERING GROUP, )
INC., )
)
    Defendant. )

This matter is before the court on Movants' motion to quash a subpoena duces tecum issued to Movant Dr. Avner Vengosh ("Dr. Vengosh") and motion for leave to file a reply. [DE-1, -15]. Defendant Jacobs Engineering Group, Inc. ("Jacobs") responded in opposition to both motions. [DE-12, -17]. For the reasons set forth below, the motion to quash is allowed, and the motion to file a reply is denied.

## I. BACKGROUND

The underlying action in the Eastern District of Tennessee involves numerous plaintiffs asserting claims for illness from exposure to hazardous substances associated with toxic fly ash located at the Tennessee Valley Authority ("TVA") cleanup site in Kingston, Tennessee, where Jacobs was hired as a contractor to remediate a coal ash spill. Am. Compl. [DE-13-3] ¶¶ 48, 50. On May 17, 2020, Movant Knoxville News Sentinel ("the Newspaper") published a story written by reporter Jamie Satterfield ("the Article") titled, "Duke University testing shows Kingston coal ash uranium at triple report levels." [DE-4-1]. The Article explains that Dr. Vengosh, a professor

at Duke University, tested coal ash samples from the Kingston plant taken in 2008, 2017, 2018, and 2019. *Id.* at 3. Dr. Vengosh concluded that the "coal ash contain[ed] more than three times the amount of uranium reported in 2009 by the Tennessee Department of Environment and Conservation and in 2011 in a joint report from TVA and [Jacobs]." *Id.* at 2–3.

On May 29, 2020, Jacobs served the subpoena duces tecum that is the subject of the instant motion on Dr. Vengosh. [DE-2-1]. Jacobs requests that Dr. Vengosh produce the following:

1. All Documents referring or relating to Your or Duke's results of any testing, analysis, sampling, or observation for the Referenced Samples, including without limitation documents related to Your comparison or evaluation of those results as it relates to scientific standard(s) for coal ash.

2. All Documents confirming, evaluating, or document[ing] the methods used by You and/or Duke to analyze the Referenced Samples.

3. All Documents referring or relating to any quality assurance and/or quality control conducted for analysis related to the Referenced Samples.

4. All Documents referring to, relating to, documenting, or constituting the chain of custody for the Referenced Samples, including without limitation shipping labels.

5. All documents referring or relating to the Referenced Samples, including without limitation sampling methodology, preservation of the Referenced Samples, dates on which the Referenced Samples were taken, locations where the Referenced Samples were collected, and/or preparation of the Referenced Samples for analysis.

6. All documents referring to, relating to, or constituting communications with any party concerning Your or Duke's analysis of the Referenced Samples, including without limitation transmittal of the analytical results, any agreement for the analytical work, and any payment for the analytical work.

7. All Documents reflecting the EPA certification for any methods or processes relied upon with respect to the Referenced Samples used by You and/or Duke and/or the lab used for the Referenced Samples.

8. All Documents reflecting the certifications for the lab used for testing, analyzing, researching, observing, or housing the Referenced Samples.

2

9. All Documents reflecting audits performed of the lab generally or related to the methods used to analyze the Referenced Samples from January 1, 2015 to the present.

[DE-2-1] at 7.

## II. DISCUSSION

Movants contend that the subpoena infringes upon the journalistic and academic freedom[1] from compelled disclosure of confidential information protected by the First Amendment. [DE-2] at 3–9. Movants further contend that the subpoena should be quashed pursuant to North Carolina's Shield Law, N.C. Gen. Stat. § 8-53.11(a)(1), (b). *Id.* at 9–11. Jacobs responds that the majority of the requests seek non-confidential information, and Dr. Vengosh may redact the identity of a confidential source. [DE-12] at 5–10. Jacobs also contends that Dr. Vengosh's study is critical to its defense in the underlying action because Jacobs relied upon the Tennessee Department of Environment and Conservation ("TDEC") test, and if those results were flawed, then Jacobs may have a defense to liability. *Id.* at 1–2.

Subpoenas issued to nonparties are governed by Rule 45 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 34(c) ("As provided in Rule 45, a nonparty may be compelled to produce a document and tangible things or to permit an inspection."). "In response to such a subpoena, a non-party may either file a motion to quash or modify the subpoena pursuant to Fed. R. Civ. P. 45(d)(3)(A), move for a protective order pursuant to Fed. R. Civ. P. 26(c), or oppose a

---

[1] Although Dr. Vengosh is a professor, he was hired to test the samples by the Newspaper, and he did so with "the intention that [his] analysis would contribute to, and be a part of, the Knoxville News Sentinel's newsgathering and reporting efforts." [DE-3] at 1–2. Accordingly, the First Amendment journalistic privilege is more applicable here than any First Amendment concern regarding academic freedom. *See Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 183, 110 S. Ct. 577, 579, 107 L. Ed. 2d 571 (1990) ("Petitioner's reliance on this Court's so-called academic freedom cases is somewhat misplaced, since, in invalidating various governmental actions, those cases dealt with attempts to control university speech that were content based and that constituted a direct infringement on the asserted right to determine on academic grounds who could teach.); *Urofsky v. Gilmore*, 216 F.3d 401, 412 (4th Cir. 2000) ("Appellees ask us to recognize a First Amendment right of academic freedom that belongs to the professor as an individual. The Supreme Court, to the extent it has constitutionalized a right of academic freedom at all, appears to have recognized only an institutional right of self-governance in academic affairs.).

motion to compel production of the subpoenaed documents pursuant to Fed. R. Civ. P. 45(d)(2)(B)." *Schaaf v. Smithkline Beecham Corp.*, 233 F.R.D. 451, 453 (E.D.N.C. 2005) (citing *United States v. Star Scientific, Inc.*, 205 F. Supp. 2d 482, 484 (D. Md. 2002)).

"Rule 45 adopts the standard codified in Rule 26" in determining what is discoverable. *Schaaf*, 233 F.R.D. at 453. Rule 26 provides for a broad scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). The rules of discovery, including Rule 26, are to be given a broad and liberal construction. *Herbert v. Lando*, 441 U.S. 153, 177 (1979); *Nemecek v. Bd. of Governors*, No. 2:98-CV-62-BO, 2000 WL 33672978, at *4 (E.D.N.C. Sept. 27, 2000). While Rule 26 does not define what is deemed relevant for purposes of the rule, relevance has been "broadly construed to encompass 'any possibility that the information sought may be relevant to the claim or defense of any party.'" *EEOC v. Sheffield Fin. LLC*, No. 1:06-CV-889, 2007 WL 1726560, at *3 (M.D.N.C. June 13, 2007) (quoting *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 473 (N.D. Tex. 2005)); *see Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238, 240 (E.D.N.C. 2010) ("During discovery, relevance is broadly construed 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (quoting *Oppenheimer Fund., Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). The district court has broad discretion in determining relevance for discovery purposes. *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 489 (4th Cir. 1992).

However, simply because "requested information is discoverable under Rule 26[b] does not mean that discovery must be had." *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004). Indeed, the court is authorized to impose appropriate limitations on discovery. Rule 26 provides that the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). Such orders may prescribe, among other measures, "forbidding the disclosure or discovery" or "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(A), (c)(1)(D).

Additionally, "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena," and the court "must quash or modify a subpoena that subjects a person to undue burden." Fed. R. Civ. P. 45(d)(1), (d)(3)(A)(iv). "In the context of evaluating subpoenas issued to third parties, a court 'will give extra consideration to the objections of a non-party, non-fact witness in weighing burdensomeness versus relevance.'" *Schaaf*, 233 F.R.D. at 453 (quoting *Indem. Ins. Co. of N. Am. Eurocopter LLC*, 227 F.R.D. 421, 426 (M.D.N.C. 2005)). The determination of the reasonableness of a subpoena requires the court to balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing it, weighing the benefits and burdens, considering whether the information is necessary and whether it is available from another source. *See* 9A Wright & Miller, *Fed. Practice & Procedure* § 2463.1 (3d ed.) (collecting cases); *Spring v. Bd. of Trustees of Cape Fear Cmty. Coll.*, No. 7:15-CV-84-BO, 2016 WL 4204153, at *1 (E.D.N.C. Aug. 8, 2016).

Although Movants' standing to challenge the subpoenas does not appear disputed, several courts have held that nonparties who are not themselves the targets of a subpoena do not have

standing pursuant to Rule 45(d)(3) to move to quash. *See, e.g., Leanders v. Yassai (In re Yassai)*, 225 B.R. 478, 481–82 (Bankr. C.D. Cal. 1998) (finding a nonparty who had engaged in business dealings with the defendant, and who wished to quash a subpoena issued to a financial institution, also a nonparty, did not have standing under Rule 45(d)(3)(A) to make such a motion despite the movant's privacy interest in the financial records sought); *Salem Vegas, L.P. v. Guanci*, No. 2:12-CV-01892-GMN, 2013 WL 5493126, at *6 (D. Nev. Sept. 30, 2013) (finding that a nonparty business did not have standing to move to quash a subpoena issued to its bank, also a nonparty, despite the business's claim that the financial documents requested were privileged and such disclosure would violate its privacy rights). Other courts, however, have held that parties or nonparties claiming privilege in the information subpoenaed from a different nonparty do have such standing to move to quash pursuant to Rule 45(d)(3). *See e.g., Broadcort Capital Corp. v. Flagler Secs., Inc.*, 149 F.R.D. 626, 628 (D. Col. 1993) (holding that a nonparty movant did have standing to move to quash a subpoena issued to another nonparty for telephone records based on the claim that the records were privileged); *Schmulovich v. 1161 Route 9, LLC*, CIV.A. 07-597FLW, 2007 WL 2362598, at *2 (D.N.J. Aug. 15, 2007) (holding that personal rights claims with respect to bank accounts gave a party standing to challenge a nonparty subpoena upon financial institutions). Because Movants assert a right or privilege relating to journalistic freedom protected by the First Amendment, the court finds that Movants have standing and will address the merits of the matter. *See Penland v. Long*, 922 F. Supp. 1080, 1082 (W.D.N.C. 1995) (considering a motion made by nonparty Sherrill Barber and nonparty River City Broadcasting, d/b/a WLOS-TV Station, to quash a subpoena issued to Barber by the plaintiff, and a motion made by nonparty Glenn O'Neal and nonparty Multimedia Newspapers of North Carolina, Inc., d/b/a The Asheville

Citizen–Times, to quash a subpoena issued to O'Neal by the plaintiff, both motions claiming a journalistic privilege).

A.  **The First Amendment and North Carolina's Shield Law protect both confidential and nonconfidential information.**

Jacobs contends that the subpoena should not be quashed because the majority of the requests do not seek confidential information, and the identity of a confidential source may be redacted from the requested shipping labels and communications to third parties. [DE-12] at 1, 5. Accordingly, Jacobs argues, the court "can avoid the First Amendment issues altogether by ordering Dr. Vengosh to comply with the subpoena while redacting information identifying any confidential source." *Id.* at 5.

However, the First Amendment protects more than simply the identity of a confidential source. In *LaRouche v. Nat'l Broad. Co.*, the Fourth Circuit adopted a balancing test for weighing a journalist's privilege against a discovery request, and that case involved disclosure of the identity of a confidential source. 780 F.2d 1134, 1139 (4th Cir. 1986). Subsequently, though, the Fourth Circuit has applied the *LaRouche* balancing test more broadly. *See Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1335 (4th Cir. 1993). The *LaRouche* test is now "applied to both confidential and nonconfidential sources and information." *Livingston v. Kehagias*, No. 5:16-CV-906-BO, 2018 WL 1278190, at *2 (E.D.N.C. Mar. 12, 2018) (citing *Penland*, 922 F. Supp. at 1084 ("the journalists' qualified privilege under the First Amendment encompasses nonconfidential information from nonconfidential sources, and [] the *LaRouche* balancing test is to be applied in a civil case even in the absence of confidentiality or vindictiveness")); *see also Federico v. Lincoln Military Hous., LLC*, No. 2:12-CV-80, 2014 WL 3962823, at *5 (E.D. Va. Aug. 13, 2014) ("though by no means an 'absolute shield,' the *LaRouche* balancing test, as applied by this Circuit and elsewhere, is a reasonable means to balance the need for information in a given civil case

7

against the First Amendment interests of the press regardless of the confidential nature of the information sought."); *Stickels v. Gen. Rental Co.*, 750 F. Supp. 729, 731 (E.D. Va. 1990) ("A number of the courts which have recognize this qualified privilege have applied it to nonconfidential, as well as confidential, sources and information."). Accordingly, Movants may assert a First Amendment journalistic privilege in the documents requested by the subpoena even though the requests may encompass more than the identity of a confidential source.

North Carolina's Shield Law similarly protects both confidential and nonconfidential information. It provides that "[a] journalist has a qualified privilege against disclosure in any legal proceeding of any confidential *or nonconfidential information, document, or item* obtained or prepared while acting as a journalist." N.C. Gen. Stat. § 8-53.11(b) (emphasis added). Requiring Movants to simply redact the identities of confidential sources and produce the documents would not substitute for an analysis of whether a journalistic privilege applies here; accordingly, the court will proceed to discuss Movants' asserted privilege under the First Amendment and the Shield Law.

**B.  Movants have a First Amendment journalistic privilege against disclosing the information.**

Movants contend that the subpoena should be quashed because they have a First Amendment privilege against disclosure of the information it seeks. [DE-2] at 2–8. The Fourth Circuit has adopted a three-factor test for balancing the First Amendment journalistic privilege against the interest in disclosing the information: "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information." *LaRouche*, 780 F.2d at 1139 (citing *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir. 1980)).

### 1. The soil toxicity is relevant.

The first factor is the degree of relevancy the documents have to the underlying action. *LaRouche*, 780 F.2d at 1139. "The standard for relevance under *LaRouche* is higher than the standard under Rule 26. Under *LaRouche*, the information must be actually relevant." *Hatfill v. New York Times Co.*, 242 F.R.D. 353, 356 (E.D. Va. 2006). In other words, the information must "help to prove or disprove the existence of a claim." *Livingston*, 2018 WL 1278190, at *2 (citing *Stickels*, 750 F. Supp at 732 ("the documents sought are clearly relevant to the case; the appearance and location of the man lift immediately after the accident may provide important information concerning the way it was being used at the time of the accident")); *see also* Fed. R. Evid. 401 (providing that relevant evidence "has any tendency to make a fact more or less probable than it would be without the evidence[,] and the fact is of consequence in determining the action.").

Movants contend that the subpoena does not seek relevant information because the underlying action was originally filed in 2013 and concerns actions by Jacobs at that time. [DE-2] at 7. Jacobs contends that the documents are relevant because if Dr. Vengosh's results are accurate and the 2009 TDEC report was not, then Jacobs may have a defense in that it relied upon the erroneous TDEC report. [DE-12] at 6–7.

To the extent that Jacobs seeks the documents to demonstrate the true soil toxicity at the Kingston plant and that TDEC's results on which it relied were erroneous, purportedly providing Jacobs a defense, the documents sought appear to be relevant. *See Federico*, 2014 WL 3962823, at *5 (holding that information was "clearly relevant" under the first prong of the *LaRouche* test because it "relates specifically to the properties and parties in the underlying actions, and encompasses evidence that could play an important role in the litigation").

9
Case 5:20-mc-00020-RJ   Document 18   Filed 09/24/20   Page 9 of 16

### 2. The soil toxicity may be obtained by alternative means.

The second factor is whether the information can be obtained by alternative means. *LaRouche*, 780 F.2d at 1139. "The second prong [of the *LaRouche* test] requires the requesting party to exhaust all other possible sources of the sought-after information." *Penland v. Long*, No. 1:94-CV-119, 1995 WL 805177, at *3 (W.D.N.C. Sept. 12, 1995). Movants contend that Jacobs may test the soil itself, because "Jacobs is in the best position to test the soil it is responsible for cleaning up." [DE-2] at 7. Movants argue that the soil toxicity issue should be resolved in expert reports and discovery, not by using Dr. Vengosh's study "to generate backdoor expert evidence." *Id.* Jacobs responds that "there is no alternative source for documentation on Dr. Vengosh's laboratory tests," and nothing but the documents sought "can establish the results and reliability of Dr. Vengosh's tests." [DE-12] at 7.

While it may be true that there are no other means through which to obtain Dr. Vengosh's documentation of his tests, the significance of the documents is not that Dr. Vengosh performed the tests, but rather that they are test results revealing the true soil toxicity at the Kingston plant. As discussed above, the soil toxicity is relevant to the underlying action, but Jacobs has not argued that it is unable to test the soil itself or that it lacks access to the 2008 samples. Accordingly, Jacobs has not shown exhaustion. The relevant information at issue—the soil toxicity—may be obtained by alternative means, so the second factor weighs in favor of quashing the subpoena. *See LaRouche*, 780 F.2d at 1139 (finding no abuse of discretion in the district court's denial of a motion to compel because LaRouche "had not exhausted reasonable alternative means of obtaining this same information . . . , and he failed to demonstrate to the court unsuccessful, independent attempts to gain the requested information."); *McCoy v. City of Columbia*, No. CV 5:10-132-JFA-KDW, 2013 WL 12377790, at *5 (D.S.C. Jan. 18, 2013) ("In the unlikely event that Defendants are

searching for other video footage of the incident, determining how Movant obtained the video at issue is not the only method they could have used to do so.").

### 3. Jacobs does not have a compelling interest in disclosure of the information.

The third factor is whether there is a compelling interest in disclosure of the information. *LaRouche*, 780 F.2d at 1139. In considering this factor, "the compelling nature of the interest in [disclosing the information] would have to be balanced against the reporter's interest in protecting the confidentiality of his sources." *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 288 n.12 (4th Cir. 2000). Movants contend that the purpose of the subpoena is to "ferret out who may have provided samples to the Newspaper," and there is no compelling interest in disclosing that information. [DE-2] at 7–9. Jacobs responds that it does not seek confidential information, and the identity of a confidential source on shipping labels and third-party communications could be redacted. [DE-12] at 7–8.

Here, Jacobs's interest in the relevant information is its potential use as a defense in the underlying action. While that interest is important, in light of the other means by which Jacobs could serve that interest—i.e., by testing the soil itself or by engaging in expert discovery—the specific interest in obtaining documentation of Dr. Vengosh's tests is not compelling. *See Federico*, 2014 WL 3962823, at *6 ("the Court is not persuaded that Defendants have made a compelling showing of need for ... documents from correspondents who are not parties to the litigation"). Accordingly, the third factor weighs in favor of quashing the subpoena.

In summary, to the extent that the subpoena seeks information relating to the soil toxicity in general, the documents sought would be relevant, but Jacobs could obtain that information through alternative means. To the extent that the subpoena seeks information about Dr. Vengosh's study in particular, such as his methods, the chain of custody of his samples, and his

communications with third parties, among other requests, the information is not relevant because it does not appear that any party in the underlying action intends to rely on Dr. Vengosh as an expert witness. Either way, in balancing the three factors of the *LaRouche* test, the journalistic privilege outweighs Jacobs's interest in disclosure of the information, and the motion to quash the subpoena is allowed.

## C.  North Carolina's Shield Law also supports quashing the subpoena.

Alternatively, Movants contend that North Carolina's Shield Law protects against disclosure of the information. The Shield Law provides that "[a] journalist has a qualified privilege against disclosure in any legal proceeding of any confidential or nonconfidential information, document, or item obtained or prepared while acting as a journalist." N.C. Gen. Stat. § 8-53.11(b). The definition of "journalist" encompasses "employees, independent contractors, or agents" of an entity "engaged in the business of gathering, compiling, writing, editing, photographing, recording, or processing information for dissemination via any news medium." *Id.* § 8-53.11(a)(1). In order to overcome the qualified privilege:

> any person seeking to compel a journalist to testify or produce information must establish by the greater weight of the evidence that the testimony or production sought:
>
> (1) Is relevant and material to the proper administration of the legal proceeding for which the testimony or production is sought;
>
> (2) Cannot be obtained from alternate sources; and
>
> (3) Is essential to the maintenance of a claim or defense of the person on whose behalf the testimony or production is sought.

*Id.* § 8-53.11(c). "The test under North Carolina statutory reporter's privilege is essentially the same test that courts have applied in interpreting the federal and state constitutional provisions governing freedom of speech and of the press." *State ex rel. Cooper v. McLeod Oil Co.*, No. 05-

CVS-13975, 2006 WL 2009079, at *2 (N.C. Super. Jan. 24, 2006); *see also State v. Peterson*, No. 01-CRS-24821, 2003 WL 22965551, at *2 (N.C. Super. June 30, 2003) ("By enacting the Shield Law, the General Assembly essentially codified the qualified reporter's privilege previously found to exist pursuant to the First Amendment to the United States Constitution and Article I, Section 14 of the North Carolina Constitution.").

Jacobs contends that the Shield Law is inapplicable because Dr. Vengosh is not an agent of the Newspaper. [DE-12] at 8–9. In his declaration, Dr. Vengosh states that Ms. Satterfield, the writer of the Article, provided him with the samples of coal ash and "commissioned [his] help as part of the Knoxville News Sentinel's ongoing investigative reporting into the Kingston Fossil Plan[t] coal ash spill." [DE-3] at 1. Dr. Vengosh further states that he "understood [his] analysis and research would contribute to a news story the Knoxville News Sentinel planned to publish and undertook that commission with the intention that [his] analysis would contribute to, and be a part of, the Knoxville News Sentinel's newsgathering and reporting efforts." *Id.* at 1–2.

From the materials presented, it appears that Dr. Vengosh is either an agent or independent contractor of the newspaper. In either case, the Shield Law applies. *See* N.C. Gen. Stat. § 8-53.11(a)(1) (providing that the definition of "journalist" encompasses "employees, independent contractors, or agents" of a newspaper). Under North Carolina law, "[a]n agent is one who acts with the authority, either express or implied, of a principal and over whom a principal exerts control." *Krusch v. TAMKO Bldg. Prod., Inc.*, 34 F. Supp. 3d 584, 589 (M.D.N.C. 2014) (citing *Holcomb v. Colonial Assocs., L.L.C.*, 358 N.C. 501, 597 S.E.2d 710, 716 (2004)); *see also Thomas v. Freeway Foods, Inc.*, 406 F. Supp. 2d 610, 617 (M.D.N.C. 2005) ("the existence of an actual agency relationship 'depends on the degree of control retained by the principal over the details of the work as it is being performed.'" (quoting *Vaughn v. N.C. Dept. of Human Res.*, 296 N.C. 683,

686, 252 S.E.2d 792 (1979))). North Carolina law distinguishes between agents and independent contractors as follows:

> The test for determining whether a relationship between parties is that of principal and agent (employer and employee), or that of employer and independent contractor, is whether the party for whom the work is being done has the right to control the worker with respect to the manner or method of doing work. As distinguished from an agent or employee, an independent contractor is not subject to interference or control by the employer with respect to the manner or method of doing the work.

*Willoughby v. Kenneth W. Wilkins, M.D., P.A.*, 65 N.C. App. 626, 633–34, 310 S.E.2d 90, 95 (1983) (citing *Little v. Poole*, 11 N.C. App. 597, 182 S.E.2d 206 (1971)); *see also Small v. WellDyne, Inc.*, No. 5:16-CV-62-BO, 2018 WL 2107607, at *8 (E.D.N.C. May 7, 2018) (applying North Carolina law and finding that a company was an independent contractor, not an agent, because the agreement stated that it was an independent contractor and "Exactus did not manage or control how WellDyne or its employees carried out the details of any prescription order submitted by Exactus"), *aff'd in part, rev'd in part* 927 F.3d 169 (4th Cir. 2019).

Here, the Newspaper commissioned Dr. Vengosh to analyze specific soil samples, provided him with those samples, and Dr. Vengosh understood that his work would be reported in the news through the publication of the Article. The degree of control retained by the newspaper over the method and manner in which Dr. Vengosh tested the samples is unclear, so the court cannot determine whether he was an agent or independent contractor. Nonetheless, in either case, the Shield Law is applicable to his study.

Because the Shield Law codifies essentially the same analysis as the *LaRouche* test, *State ex rel. Cooper*, 2006 WL 2009079, at *2, the discussion of the First Amendment journalistic privilege above explains why Jacobs has not met its burden in showing that the information "cannot be obtained from alternate sources" and "[i]s essential to the maintenance of a claim or

14
Case 5:20-mc-00020-RJ   Document 18   Filed 09/24/20   Page 14 of 16

686, 252 S.E.2d 792 (1979))). North Carolina law distinguishes between agents and independent contractors as follows:

> The test for determining whether a relationship between parties is that of principal and agent (employer and employee), or that of employer and independent contractor, is whether the party for whom the work is being done has the right to control the worker with respect to the manner or method of doing work. As distinguished from an agent or employee, an independent contractor is not subject to interference or control by the employer with respect to the manner or method of doing the work.

*Willoughby v. Kenneth W. Wilkins, M.D., P.A.*, 65 N.C. App. 626, 633–34, 310 S.E.2d 90, 95 (1983) (citing *Little v. Poole*, 11 N.C. App. 597, 182 S.E.2d 206 (1971)); *see also Small v. WellDyne, Inc.*, No. 5:16-CV-62-BO, 2018 WL 2107607, at *8 (E.D.N.C. May 7, 2018) (applying North Carolina law and finding that a company was an independent contractor, not an agent, because the agreement stated that it was an independent contractor and "Exactus did not manage or control how WellDyne or its employees carried out the details of any prescription order submitted by Exactus"), *aff'd in part, rev'd in part* 927 F.3d 169 (4th Cir. 2019).

Here, the Newspaper commissioned Dr. Vengosh to analyze specific soil samples, provided him with those samples, and Dr. Vengosh understood that his work would be reported in the news through the publication of the Article. The degree of control retained by the newspaper over the method and manner in which Dr. Vengosh tested the samples is unclear, so the court cannot determine whether he was an agent or independent contractor. Nonetheless, in either case, the Shield Law is applicable to his study.

Because the Shield Law codifies essentially the same analysis as the *LaRouche* test, *State ex rel. Cooper*, 2006 WL 2009079, at *2, the discussion of the First Amendment journalistic privilege above explains why Jacobs has not met its burden in showing that the information "cannot be obtained from alternate sources" and "[i]s essential to the maintenance of a claim or

defense of the person on whose behalf the testimony or production is sought." N.C. Gen. Stat. § 8–53.11(c); *see also Higgins v. Young*, No. 97-CVD-563, 2001 WL 1692379, at *2 (N.C. Super. Aug. 8, 2001) (finding that "Mr. Young has not satisfied the requirements of N.C. Gen. Stat. § 8–53.11(c) to overcome the reporter's privilege" because "there is insufficient evidence that the information sought is material, relevant and essential to the outcome of this matter[;] . . . the information has not been unsuccessfully sought from all other available sources[;] and the Court is without knowledge of whether this information could have been obtained from other sources"). Accordingly, North Carolina's Shield Law provides an alternative reason for quashing the subpoena.

**D.     Movants' motion to file a reply is denied.**

Movants filed a motion for leave to file a reply memorandum in support of the motion to quash. [DE-16]. Movants contend that a reply is warranted because Jacobs raised new arguments in its response regarding the relevancy of the requested documents. *Id.* at 1–2. Jacobs filed a response in opposition, contending that Movants had the opportunity to address relevance in their opening brief and did so. [DE-17] at 1–4.

The court's local rules provide that replies are not permitted in discovery disputes. Local Civil Rule 7.1(g)(2), 26.1(d)(3). Additionally, here, the motion to quash is resolved in Movants' favor without a reply brief. Accordingly, the motion to file a reply is denied.

### III. CONCLUSION

For the foregoing reasons, Movants' motion to quash the subpoena [DE-1] is ALLOWED, and Movants' motion for leave to file a reply memorandum [DE-15] is DENIED.

So ordered, the 23 day of September 2020.

Robert B. Jones, Jr.
United States Magistrate Judge